**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NINA BLACKBURN, *et al*,

     *Plaintiffs,*

    *v.*

GRETCHEN WHITMER and
HEIDI E. WASHINGTON,

     *Defendants.*

_____/

CASE NO. 20-cv-12579
DISTRICT JUDGE LAURIE J. MICHELSON
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER (ECF No. 1) AND PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT (ECF No. 13)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiffs' Motion for Temporary Restraining Order, (ECF No. 1), be **DENIED**, and Plaintiffs' Motion for Default Judgment, (ECF No. 13), also be **DENIED**.

## II.    REPORT

### A.    Introduction

On September 9, 2020, Plaintiffs, who appear before the Court *pro se*, filed a complaint against Defendants Heidi Washington, Director of the Michigan Department of Corrections, and current Michigan Governor Gretchen Whitmer (collectively, "Defendants"), under 42 U.S.C. § 1983 alleging a violation of the Eighth Amendment. (ECF No. 1, PageID.2.)

Plaintiffs' complaint included within it a Motion for a Temporary Restraining Order ("TRO"). Judge Michelson, in an Order on October 6, 2020, noted that a Motion for a TRO cannot be part of a complaint but, "in light of the potential delays that re-filing might pose," decided to consider the Motion for a TRO as filed with the complaint, nonetheless. (ECF No. 4, PageID.156-157.) Plaintiffs filed a Motion for Default Judgment on October 23, 2020. (ECF No. 13.) Defendants responded to that Motion on November 2, 2020. (ECF No. 14.) All pretrial matters were reassigned to the undersigned Magistrate Judge on October 26, 2020. (ECF No. 10.) Below, I summarize the allegations set forth in the instant Motions, as well as allegations in the complaint insofar as they correspond to the relief sought at this juncture.

## 1.    Factual Background

Plaintiffs in this case are a combination of 12 inmates at Cooper Street Correctional Facility in Jackson and four non-inmate Plaintiffs (who are three residents of Pontiac and one resident of Bay City). The non-inmate Plaintiffs, Nina Blackburn, Thomas Scott, Rochelle Brady, and Donovan Tillery, claim to be "acting on behalf of all Michigan Citizenry/General population thereof." (ECF No. 1, PageID.2.) In Plaintiffs' complaint, they allege that Governor Gretchen Whitmer and Heidi Washington have "acted conspiratorially, knowingly, intelligently, and wanton negligently" regarding the spread of COVID-19, which has negatively affected the "mental and physical well beings, health, and very lives" of the general public and inmates. (ECF No. 1, PageID.8.) Plaintiffs emphasize Whitmer's Executive Order No. 2020-29, which specified steps to keep incarcerated Michigan citizens safe from the virus. (*Id*. at PageID.9.) Plaintiffs claim that,

referring to a conspiracy of some kind between the two, Whitmer and Washington "work[ed] by collaborating and/or combinedly, and wrote their protocols and procedures in the form of Administrate Acts having the force of law"; Plaintiffs then refer to Washington's "Director's Office Memorandums (DOMs)." (*Id.* at PageID.10.) Plaintiffs argue that, after several grievances filed by inmate Plaintiffs were denied at various Steps, "[t]his Court can clearly see that the Defendants have been covering-up their illegal actions, and after having allegedly put their so called laws, rules and regulations into place that they don't even follow them themselves, proving a case for imminent danger and warranting their request for a [TRO] . . . ." (*Id.* at PageID.12.) Specifically, Plaintiffs point to "violations" including "officers not wearing masks, PPE not being given, social distancing protocols looked at as being a joke to the Defendants . . . ." (*Id.*) In short, it appears that Plaintiffs take issue with Whitmer's and Washington's handling of the COVID-19 virus within Michigan prisons.

In seeking a TRO to resolve this alleged injury, Plaintiffs request that Defendants: (1) "identify within one day throughout the entire [MDOC] prison system for those prisoners whom have been and/or are presently documented with pre-existing medical conditions"; and (2) "thereafter within fourteen days transfer all said prisoners into facilities and/or cells/rooms that are single-man cells . . . ." (*Id.* at PageID.15.) Plaintiffs note that several of the inmate Plaintiffs suffer from health conditions including severe obesity, high blood pressure, diabetes, collapsed lungs, heart murmurs, asthma, and respiratory issues, to name a few. (*Id.* at PageID.19-20.)

## 2.      Procedural Background

After Plaintiffs filed their complaint and Motion on September 9, 2020, the Court entered an Order explaining that "[t]he Court cannot rule on the request for a temporary restraining order until Plaintiffs serve Defendants with the motion and the Defendants have an opportunity to respond (when, as here, the requirements for *ex parte* relief have not been satisfied)." (ECF No. 4, PageID.156.) (footnote omitted). Still, though, the Court held that "[i]n light of the potential delays that re-filing might pose, the Court will consider the motion for the TRO as filed within the complaint[.]" (*Id.* at PageID.157.) Plaintiffs had not yet served the complaint on Defendants at that time, and the Court ordered that they do so by October 16, 2020. (*Id.*) The Court further ordered that Defendants "shall file a response to the Motion for a [TRO] within seven days of service." (*Id.* at PageID.158.)

On October 23, 2020, Plaintiffs filed an "emergency motion to default upon defendants for failure to respond[] to deadline court ordered." (ECF No. 13.) Because it refers to an "order for Default Judgment" and relies on Federal Rule of Civil Procedure 55(b)(2), it will be construed as a Motion for Default Judgement by the Court.

Plaintiffs seek an order for default judgment due to Defendants' late response. Plaintiffs were ordered to affect service by October 16, 2020, and Defendants were ordered to respond within seven days; or, by October 23, 2020. (*See* ECF No. 4.) Plaintiffs appear to have provided evidence of service on the Defendants, via certified mail, on October 8, 2020, although it is not entirely clear to this writer to whom the service was addressed, (ECF No. 9), and there does not appear to be evidence of receipt of this service by Defendants. Plaintiffs argue in their Motion that they served Defendants on October 8, then

returned the certification from their verified mail to the Court on October 15, 2020. (ECF No. 13, PageID.529.) Defendants did not file their Response to the original complaint and Motion for a TRO until October 28, 2020. (ECF No. 11.)

On November 2, 2020, Defendants filed a Response to the Motion for Default Judgment. (ECF No. 14.) Defendants argue in this Response that, contrary to Plaintiffs' assertions, they were not properly served. Specifically, Defendants argue:

> On October 26, 2020, this Court entered Plaintiffs proof of service into the PACER docket and backdated the date of filing as October 15, 2020. (ECF No. 9.) These proofs of service appear to show that "DTMB Delivery Services" signed for receipt of mail received on October 8, 2020. (ECF No. 9, Page ID.171-172.) The proofs of service do not show that delivery of the mail was restricted to Defendants Whitmer or Washington, or that Defendants Whitmer or Washington signed anything.

(ECF No. 14, PageID.542.) Apparently, the service sent by Plaintiffs to Whitmer contained a document addressed to Washington, and "at the date of filing this response, the Governor's office still have not received a summons addressed to Defendant Whitmer in this case." (*Id*. at PageID.541.) To support this, Defendants have submitted a declaration from Kristina Gierhart, Executive Assistant in the Office of the Governor, confirming as much. (ECF No. 15.)

## B.    Emergency Motion for Default Judgment

First, Defendants argue that they were not properly served. Federal Rule of Civil Procedure 4(e) provides that an individual may be served by:

> (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

> (2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

It appears that Plaintiffs here have followed the rule prescribed by the state of Michigan regarding service and have attempted to mail the relevant documents to Defendants via certified mail. *See* Fed. R. Civ. P. 4(e)(1); Mich. Ct. R. 2.105; (ECF No. 9.) However, as Defendants argue, the mail seems to have been addressed only to "DTMB Delivery Services," and a signed receipt does not appear in the records or docket to this case in violation of Michigan Court Rule 2.105. *See Jones v. F.C.I. Milan Low Staff*, No. 17-cv-13222, 2019 WL 2078988, at *3 (E.D. Mich. Apr. 8, 2019). Further, it appears that Defendant Whitmer never received a copy of the summons and complaint. (*See* ECF No. 15.) This may have been because the service was not addressed to Defendant Whitmer at all. While the process by which this service was effectuated is muddled, in the end, I suggest that it was not proper; therefore, Plaintiffs' Motion for Default Judgment should be denied.

In the interest of thoroughness, I will consider whether an entry of default would be proper assuming service was proper on Defendants. Default can occur when the defendant fails to appear in a case, or having appeared, fails to answer the complaint or otherwise defend against it. Fed. R. Civ. P. 55(a). Pursuant to Rule 55 of the Federal Rules of Civil Procedure, a two-step procedure is required to obtain a default judgment. First, "[w]hen a

6

party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Once this step has been completed, a plaintiff may proceed to request entry of a default judgment. Fed. R. Civ. P. 55(b). "If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk – on the plaintiff's request, with an affidavit showing the amount due – must enter judgment for that amount and costs . . . ." Fed. R. Civ. P. 55(b)(1). "In all other cases, the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2).

"This Rule contemplates a two-step process in obtaining a default judgment against a defendant who has failed to plead or otherwise defend[,]" *Berk v. Moore*, No. 2:10-cv-1082, 2012 WL 3780303, at *2 (S. D. Ohio August 31, 2012) (quotation and citation omitted):

> First, a plaintiff must request from the Clerk of Court an entry of default, describing the particulars of the defendant's failure to plead or otherwise defend. Fed. R. Civ. P. 55(a). If default is entered by the Clerk, the plaintiff must then move the court for entry of default judgment. Fed. R. Civ. P. 55(b).

*Id*. Here, "plaintiffs' requests for default judgment do not follow this two-step process but instead collapse the two steps into a single step. This defect alone warrants denial of plaintiffs' requests." *Id*. (*citing Devlin v. Kalm*, No. 11–1261, 2012 FED App. 0876N, at *20–21 (6th Cir. Aug. 9, 2012) ("[I]t was procedurally improper for Plaintiff to move for entry of default judgment without first obtaining an entry of default from the clerk."); *Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 193 (6th Cir. 1986)

("[E]ntry of default is just the first procedural step on the road to obtaining a default judgment[.]")).

"Even overlooking this defect, plaintiffs' requests for default judgment are without merit. An entry of default is appropriate only where a party 'has failed to plead or otherwise defend[.]'" *Id.* (*quoting* Fed. R. Civ. P. 55(a)). Here, Defendants have filed a response to Plaintiffs' combined complaint and Motion, albeit one week later than Judge Michelson's order demanded; still, Defendants have not "failed to plead or otherwise defend" this action. Fed. R. Civ. P. 55(a).

Indeed, in *Fox v. U.S. Postal Service*, No. 18-cv-10901, 2019 WL 1034221, at *3 (E.D. Mich. March 5, 2019), this Court held that "even if [the defendant] had filed its motion a day or two late, the Court would entertain (and in all likelihood grant) a motion to set aside the default. [The defendant] has defended this case and any minor tardiness did not prejudice [the plaintiff.] Nor did [the plaintiff] properly obtain a default." *Id.* (*citing Sherrills v. Berryhill*, No 17-cv-00302017, U.S. Dist. LEXIS 58937, at *5, 2017 WL 1399988 (N.D. Ohio Apr. 4, 2017) ("While the entry of default is a procedural formality, courts have held it is nevertheless a prerequisite to the issuance of a default judgment.").

Further, in *Brothers Gas & Food v. Catlin Specialty Ins. Co.*, this Court held "to the extent Catlin argues that Brothers has not actually moved to set aside the clerk's default, courts have held that filing an answer (or other opposition to a motion for default judgment) may be treated as a motion to set aside entry of default. No. 13-cv-13061, 2014 WL 106783, at *3 (E.D. Mich. Jan. 10, 2014) (*citing United Coin Meter Co., Inc. v. Seaboard Coastline*

*R.R.*, 705 F.2d 839, 844 (6th Cir. 1983)). "Thus, the issue to be decided is whether the default obtained by Catlin should be set aside pursuant to Fed. R. Civ. P. 55(c)." *Id.*

Rule 55(c) provides that the Court may set aside an entry of default for "good cause." Fed. R. Civ. P. 55(c). "In *United Coin Meter Co.*, the Sixth Circuit set forth a three-factor test for determining whether good cause exists to set aside a default pursuant to Rule 55(c): (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; and (3) whether willful or culpable conduct of the defendant led to the default." *Brothers Gas and Food*, 2014 WL 106783, at \*3 (citing *United Coin Meter Co.*, 705 F.2d at 845). "Federal courts, in their determinations to set aside defaults, strongly favor decisions on the merits." *Id.* (quotation and citation omitted).

The Court does not find reason to believe that Defendants' Response, which was filed a week late of the latest possible deadline, was "willful or culpable." *Brothers Gas & Food*, 2014 WL 106783, at \*4. "To be considered culpable or willful conduct, 'the conduct of a defendant must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of its conduct on those proceedings.'" *Id.* (*quoting Shepard Claims Service, Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 194 (6th Cir. 1986)). Evidence of a display or intent to "thwart judicial proceedings" does not exist here; in fact, it is unclear to this writer exactly when Defendants received Plaintiffs' complaint and Motion, although it appears to have been mailed on October 8. Neither does the minimal delay evidence a "reckless disregard" for the proceedings in this case. Further, this Court fails to find evidence that Plaintiffs have been prejudiced by the late filing of a response—indeed, it was only one week after what would have been the latest date allowed by the Court. And,

9

as will be analyzed in the following section of this Report, Defendants do present a meritorious defense.

As such I recommend that Plaintiffs' Motion for Default Judgment be denied. I suggest that a default judgment against Defendants is not warranted at this time.

### C.      Motion for TRO

Plaintiffs move for a TRO or preliminary injunction which would require that the prison administration identify all inmates in all Michigan facilities with a health risk which places them at a higher risk for COVID-19 and move them to sperate, single-man cells, within two weeks. When considering whether to issue preliminary injunctive relief, a court must balance the following four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.

*Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). Because preliminary relief is "an extraordinary remedy," the movant must make a far more stringent showing of proof than that required to survive summary judgment. *Winger v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 425 (6th Cir. 2014). "Although no one factor is controlling," a movant who cannot demonstrate likelihood of success on the merits typically cannot attain preliminary relief. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). Even so, Plaintiffs need not present an "overwhelming" showing of potential success on the merits in order to prevail in their motion. *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 679 (S.D. Ohio 2012).

"[W]here a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting." *Sango v. Wakley*, No. 1:14-cv-703, 2014 WL 3894652, at *2 (W.D. Mich. Aug. 8, 2014).

### 1.      Likelihood of Success on the Merits

#### a.      Non-inmate Plaintiffs' Standing

Defendants argue that the non-inmate Plaintiffs do not have standing to bring this suit on behalf of the inmate Plaintiffs, and further that the inmate Plaintiffs do not have standing themselves for failure to exhaust their administrative remedies. I agree with these arguments and suggest that, as such, Plaintiffs do not present a strong likelihood of success on the merits.

First, Defendants argue that the non-inmate Plaintiffs do not have standing to bring this suit along with the inmate Plaintiffs. "[B]efore a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Indeed, a plaintiff must demonstrate that he has suffered an "injury in fact" which is (a) concrete and particularized, and (b) actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). There must be a causal connection between the injury and the conduct complained of, it must be fairly traceable to the challenged action of the defendant, and it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id*.

11

Defendants argue that non-inmate Plaintiffs are not "affected by a concrete injury that is actual or imminent in any prison setting. It is not even clear what relationship, if any the non-inmate Plaintiffs have to the inmate Plaintiffs." (ECF No. 11, PageID.204.) Defendants rely on caselaw that provides a litigant "may bring his own claims to federal court without counsel, but not the claims of others." *Fymbo v. State Farm Fire & Cas. Co.*, 213 F.3d 1320, 1321 (10th Cir. 2000). *See also Tate v. United States*, 72 F. App'x 265, 266 (6th Cir. 2003) (affirming district court's dismissal of habeas petition brought by prisoner's mother on behalf of prisoner for lack of standing); 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel[.]").

This argument is persuasive. It is true that four of the Plaintiffs are not inmates, and this writer has not found evidence relating them to the presently incarcerated Plaintiffs. Further, to the extent that Plaintiffs bring this suit on behalf of the "general population," I suggest that a particularized injury in fact is not present here. The four Plaintiffs who are non-inmates lack standing to bring this suit, and thus, a likelihood of success on the merits does not appear possible.

### b.   Inmate Plaintiffs' Failure to Exhaust

Defendants posit that the inmate Plaintiffs "failed to exhaust their remedies by either neglecting to file Step III grievances related to this suit, failing to follow MDOC procedures and getting their grievances rejected instead of being addressed on the merits, or by failing to wait until the grievance process was fully resolved before filing this civil action." (ECF No. 11, PageID.205.) Further, Defendants argue, "the only inmate Plaintiffs to exhaust

12

substantive grievances during the timeframe relevant to the COVID-19 pandemic—Derickson, Pierson, and Triplett—failed to exhaust any claims against Defendant Whitmer or Washington by failing to name either Defendant in their grievances, and by failing to exhaust any grievances related to COVID-19." (*Id*. at PageID.206.)

Congress passed the Prison Litigation Reform Act of 1995 (PLRA) in response to a "sharp rise in prisoner litigation in the federal courts." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). By passing the PLRA, Congress attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] claims [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 203 (2007). A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement, *Woodford*, 548 U.S. at 84: "No action shall be brought with respect to prison conditions under [§ 1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a) (2000).

The *Woodford* Court held that a prisoner has exhausted his or her administrative remedies when (1) no remedies currently remain available, and (2) the remedies that had been available to the prisoner were "properly" exhausted. 548 U.S. at 93. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id*. at 90. Complaints and appeals must be filed "in the place, and at the time, the prison's administrative rules require." *Id*. at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

In *Jones*, the Court determined whether a plaintiff needed to identify the defendant by name during the initial grievance process. Since the MDOC's policy at the time did not

require that level of specificity, the Court did not find that the PLRA required it. *Id*. at 218. However, the current MDOC policy requires this level of specificity. MDOC Policy Directive ("PD") 03.02.130 (eff. July 9, 2007). A plaintiff does not need to show proper exhaustion as a part of his or her complaint. *Jones*, 549 U.S. at 216. Rather, failure to properly exhaust remedies is an affirmative defense.

The MDOC provides prisoners with a grievance procedure for bringing forward their concerns and complaints. *See* MDOC PD 03.02.130 (eff. July 9, 2007). The MDOC's grievance procedure consists of steps that a prisoner must follow prior to filing a complaint in court, and each step is accompanied by a time limit. First, the grievant must attempt to resolve the issue with the person involved "within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control." MDOC PD 03.02.130(P). If the initial attempt to resolve the issue with the person involved is impossible or unsuccessful, the inmate must then submit a Step I grievance form within five days. MDOC PD 03.02.130(V). If the grievance is accepted, the prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(X).

If the inmate is not satisfied with the response, or does not receive a response within fifteen days, he must file a Step II appeal within ten business days. MDOC PD 03.02.130(BB). Once again, if the inmate is dissatisfied with the response at Step II or does not receive a Step II response within fifteen days, he has ten business days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(FF). The Step III response concludes the administrative grievance process. According to MDOC policy, a grievance

is not complete until the MDOC has responded to the Step III grievance. MDOC PD 03.02.130(B). *Woodford* and *Jones* require inmates to file grievances that conform to MDOC procedures to properly exhaust their available remedies. 548 U.S. at 93; 549 U.S. at 218.

Defendants' Exhibit I, attached to their Response to Plaintiffs' Motion, "reflects all Step III grievances filed by the 12[1] inmate Plaintiffs from January 2020 to present." (ECF No. 11, PageID.208.) Indeed, upon review of the provided documents, it does appear that only Plaintiffs Derickson, Pierson (who apparently filed several grievances), and Triplett properly made it to Step III of this process. However, Defendants note that none of these Plaintiffs named Defendant Whitmer or Washington in their grievances—and their attached chart,[2] which details the grievances filed by the various 16 Plaintiffs, points out that, to the extent remedies were exhausted, those grievances did not concern any issues related to COVID-19. (*See* Exhibit I, ECF No. 11, PageID.521-522.) It is true that none of the three inmates with viable grievances named Whitmer or Washington in their grievances, and only Pierson raised issues concerning COVID-19 in his grievances. (*See* ECF No. 11, Exhibit E, PageID.455-476.) MDOC policy requires an individual to be identified in a grievance for it to be exhausted, MDOC Policy Directive ("PD") 03.02.130 (eff. July 9, 2007), and *Woodford* and *Jones* require inmates to file grievances that conform

---

[1] According to Defendants, only 12 of the 16 inmate Plaintiffs to this suit were prisoners at the time this suit was actually filed. (ECF No. 11, PageID.208.)

[2] I point out that Defendants provide a chart of the relevant grievances filed, which includes dates, summaries, and Steps reached of the grievances. Considering the number of Plaintiffs in this case, the chart is helpful and succinct in my opinion; however, copies of Derickson's, Peirson's, and Triplett's grievances are attached at Exhibit E to ECF No. 11 in full.

to MDOC procedures to properly exhaust their available remedies. 548 U.S. at 93; 549 U.S. at 218. For these reasons it does appear that even the Plaintiffs who are prisoners have not exhausted their administrative remedies in this case, and these claims therefore do not present a likelihood of success on the merits.

### c. Deliberate Indifference

To the extent that a Plaintiff has standing or has exhausted his or her administrative remedies, I turn now to the likelihood of success on the merits of their Eighth Amendment claims. In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's Cruel and Unusual Punishment Clause because it "constitutes the 'unnecessary and wanton infliction of pain'" and is "repugnant to the conscience of mankind" by offending our "'evolving standards of decency.'" 429 U.S. 97, 104-05 (1976) (*quoting Gregg v. Georgia*, 428 U.S. 97, 104 (1976); *Louisiana v. Resweber*, 329 U.S. 459, 471 (1974) (FRANKFURTER, J., concurring)). To establish a cognizable claim, Plaintiffs' allegations must show Defendants' "sufficiently harmful" acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care . . . will not violate the Constitution." *Id.*

The 'deliberate indifference' inquiry incorporates objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The objective inquiry asks whether the deprivation was "sufficiently serious," which a claimant satisfies where it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th

Cir. 2004) (*quoting Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)) (internal quotation marks omitted). Further, the objective element is met where Plaintiff demonstrates that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *see also Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) (*quoting Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 361 (6th Cir. 2013)) (explaining that a plaintiff satisfies "the objective component by showing that, 'absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm'").

The subjective inquiry considers whether official's state of mind was sufficiently culpable; it requires a showing that an official "knows of and disregards an excessive risk to inmate health or safety." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (*quoting Farmer*, 511 U.S. at 837) (internal quotation marks omitted). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.*

First, the objective component: Plaintiff has demonstrated that he is "incarcerated under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834, and thus has satisfied the objective component regarding his claims as to virus protection. The Sixth Circuit held the same in *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020):

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are 'incarcerated under conditions posing a substantial risk of serious harm.' *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. . . . The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a

17

> substantial risk that petitioners at Elkton will be infected with COVID-19
> and have serious health effects as a result, including, and up to, death.
> Petitioners have put forth sufficient evidence that they are 'incarcerated
> under conditions posing a substantial risk of serious harm.' *Farmer*, 511 U.S.
> at 834.

961 F.3d at 840. Indeed, the same is true in this case. The objective component of the

deliberate indifference is met.

Next, Plaintiff must establish the subjective component: that Defendants' state of

mind was sufficiently culpable, and must demonstrate that the officials "know[] of and

disregard[] an excessive risk to inmate health or safety." *Harrison*, 539 F.3d at 518; "the

official must both be aware of the facts from which the inference could be drawn that a

substantial risk of harm exists, and he must also draw the inference." *Id.* In this instance, it

would be difficult for Defendants to argue in good faith that they were not aware of the

health risk posed by the virus, as reports of it has dominated the news cycle for months.

However, the inquiry is whether Defendant acted unreasonably in light of this information.

In *Wilson*, the Sixth Circuit held that "[t]he key inquiry is whether the [prison] responded

*reasonably* to th[is] risk." *Wilson*, 961 F.3d at 840 (*citing Farmer,* 511 U.S. at 844

(emphasis added)). There, the plaintiffs, inmates at Elkton prison, "on behalf of themselves

and current and future inmates at Elkton, allege[d] that their confinement in the midst of

the COVID-19 outbreak violates the Eighth Amendment." *Wilson*, 961 F.3d at 835. In this

case, in support of their argument that Defendants and the MDOC have acted reasonably

in light of the pandemic, Defendants argue:

> MDOC has established itself as a national leader in prison COVID-19
> responses, taking measures as early as March 2020 which included (a)
> ceasing all in-person visitation, (b) requiring an extra layer of approval for

facility transfers, (c) implementing screening measures for all persons seeking entry to MDOC facilities, (d) ensuring more frequent cleanings of prison cells took place, (e) ensuring prisoners had adequate access to soap for handwashing, (f) displaying CDC posters detailing hygiene practices throughout MDOC facilities, (g) encouraging and enforcing social distancing, and (h) taking measures to minimize in-person attendance at parole board hearings. (Ex. C, ¶ 10.)

(ECF No. 11, Page ID.220-221.)

The steps taken by the Elkton prison administration in *Wilson* were not significantly different from the steps taken in this case, *see Wilson*, 961 F.3d at 841; there, the Sixth Circuit held that "while the harm imposed by COVID-19 on inmates at Elkton 'ultimately [is] not averted,' the BOP has 'responded reasonably to the risk' and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights." *Id*. (*quoting Farmer*, 511 U.S. at 844.) Notably, *Wilson* points out that "[o]ur sister circuits have concluded that similar actions by prison officials demonstrate a reasonable response to the risk posed by COVID-19." *Id*. (*citing Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020) (per curiam); *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam); *Marlowe v. LeBlanc*, No. 20-30276, 810 Fed. Appx. 302 (5th Cir. Apr. 27, 2020) (per curiam). So too here, as in *Wilson*, the policies and procedures set in place are reasonable—Defendants have not been deliberately indifferent to the virus or to the prisoners' vulnerable position. Defendants have taken department-wide measures to ensure the safety and health, to a reasonable extent, of the individuals in their care.

For these reasons, Plaintiffs have not demonstrated a likelihood of success on the merits of their Eighth Amendment claims.

2.      **Irreparable Injury**

When constitutional rights are threatened or impaired, irreparable injury is presumed. *See Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (noting that "a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."). "In determining whether a plaintiff has shown irreparable injury, courts consider the substantiality of the injury alleged, the likelihood of its occurrence, and the adequacy of the proof provided." *Reuther v. Chapman*, No. 07-CV-12249, 2007 WL 4790803, at *2 (E.D. Mich. Oct. 22, 2007) (*citing Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)).

"But if a court finds it unlikely that a plaintiff will succeed on the merits of a constitutional claim, the argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit." *Van Diver v. Nagy*, No. 20-11340, 2020 WL 4696598, at *5 (W.D. Mich. Aug. 13, 2020) (quotation and citation omitted.)

It appears unlikely that Plaintiffs will face an immediate and irreparable injury absent a TRO in light of the significant preventative measures taken by MDOC to prevent the spread of COVID-19; especially considering that some of the Plaintiffs to this case are not presently incarcerated. The irreparable-injury factor weighs in favor of the denying the Motion for a TRO.

### 3.    Remaining TRO Factors

"Given that Plaintiff has failed to show either a substantial likelihood of success on the merits or a threat of irreparable injury, the last two factors of the four factor balancing test do not alter the outcome of this case." *White v. Corr. Medical Services*, No. 1:08-CV-277, 2009 WL 529082, at *4 (W.D. Mich. Mar. 2, 2009) (*citing Gonzalez v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.")); *see also In re DeLorean Co.*, 755 F.2d 1223, 1228 (6th Cir.1985) (noting that the district court may decline to analyze all four factors where fewer factors are dispositive of the issue). Further, regarding the public interest at stake, "the Court's intervention in internal prison operations without an urgently compelling and extraordinary reason is viewed as against the public interest." *Miles v. Kentucky Dep't of Corr.*, No. 16-cv-P73, 2016 WL 3636070, at *4 (W.D. Ky. June 29, 2016) (*citing Lang v. Thompson*, No.10-CV-379, 2010 WL 4962933, at *7 (E.D. Ky. Nov. 30, 2010)).

In summary, because of Plaintiff's failure to allege facts which support a likelihood of success on the merits or immediate and irreparable harm, I recommend that Plaintiffs' Motion for a TRO be denied.

### D.    Conclusion

For the reasons discussed above, **IT IS RECOMMENDED** that Plaintiff's Motion for Temporary Restraining Order, (ECF No. 1.), be **DENIED**, and Plaintiff's Motion for Default Judgment, (ECF No. 13.), also be **DENIED.**

III.  **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 12, 2020                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge